**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. DORIAN RAGLAND, Defendant. | No. 06-CR-1-LRR **SENTENCING MEMORANDUM** |

## I. INTRODUCTION

In this sentencing, the court must resolve three contested legal issues. In calculating Defendant Dorian Ragland's advisory Sentencing Guidelines range, the court must determine whether the following three adjustments are appropriate: (1) a two-level enhancement, pursuant to USSG §2D1.1(b)(1), for possession of a dangerous weapon; (2) a two-level enhancement, pursuant to USSG §3B1.1(c), for aggravated role in the offense; and (3) a downward departure, pursuant to USSG §5K2.10, for victim's conduct.

## II. PROCEDURAL BACKGROUND

On January 10, 2006, the grand jury charged Defendant in a two-count Indictment. Count 1 charged that, on or about January 9, 2001, Defendant knowingly and intentionally distributed a mixture or substance containing a detectable amount of heroin to Z.L., resulting in Z.L.'s death, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Count 2 alleged that, on or about the same date, Defendant was a user of controlled substances in possession of two firearms, namely, an SKS assault rifle and an AK-47 semi-automatic assault rifle, in violation of 18 U.S.C. § 922(g)(3).[1] On August 24, 2006, the court

---

[1] On January 9, 2006, the government filed a one-count Information against Defendant. Count 1 of the Information alleged that, on or about January 9, 2001,
(continued...)

dismissed Count 2 on the government's motion.

On August 28, 2006, a jury trial commenced. On September 5, 2006, after three days of deliberation, the jury notified the court that it was deadlocked. On the same date, the court granted Defendant's motion for a mistrial.

On October 23, 2006, a second jury trial commenced. On October 25, 2006, the jury unanimously found Defendant guilty of the crime charged in Count 1 of the Indictment. In response to an interrogatory, the jury also unanimously found "that the heroin distributed by [Defendant] was a contributing factor in the death of [Z.L.]." Verdict Form (docket no. 127-2) at 2.

On February 7, 2007, the United States Probation Office ("USPO") prepared a Presentence Investigation Report ("PSIR"). On February 28, 2007, the USPO revised the PSIR.

On March 19 and 21, 2007, the government and Defendant filed their respective sentencing memoranda. On April 16, 2007, the government filed an amendment to its sentencing memorandum.

On May 1, 2007, sentencing proceedings commenced at an evidentiary hearing ("Hearing") before the undersigned. Assistant United States Attorney C.J. Williams represented the government. Attorney Jeffrey J. Neslund represented Defendant, who was personally present.

### III. SENTENCING FRAMEWORK

The advisory Sentencing Guidelines remain the "'critical starting point'" for assessing the reasonableness of a defendant's sentence. *United States v. Rouillard*, 474

---

[1](…continued)
Defendant knowingly and intentionally distributed a mixture or substance containing a detectable amount of heroin to Z.L., resulting in Z.L.'s death, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). On April 12, 2006, Chief Magistrate Judge John A. Jarvey dismissed the Information.

2

F.3d 551, 555 (8th Cir. 2007) (quoting *United States v. Mashek*, 406 F.3d 1012, 1016 n.4 (8th Cir. 2005)). "[T]he first step in sentencing a defendant is to determine the appropriate advisory [Sentencing] Guidelines range, including traditional departures." *United States v. Hodge*, 469 F.3d 749, 755 (8th Cir. 2006) (citing *United States v. Haack*, 403 F.3d 997, 1002-03 (8th Cir. 2005)). After the court determines a defendant's advisory Sentencing Guidelines range, it must "'then consider the factors set forth in 18 U.S.C. § 3553(a) to determine whether to impose a sentence under the Sentencing Guidelines.'" *United States v. Lynch*, 477 F.3d 993, 995-96 (8th Cir. 2007) (quoting *United States v. Davis*, 457 F.3d 817, 825-26 (8th Cir. 2006)).

At the Hearing, the parties fully litigated all contested advisory Sentencing Guidelines issues. In the instant Sentencing Memorandum, the court calculates Defendant's advisory Sentencing Guidelines range. To the extent necessary, the court makes factual findings by a preponderance of the evidence. *See United States v. Bah*, 439 F.3d 423, 426 n.1 (8th Cir. 2006) ("[J]udicial fact-finding using a preponderance of the evidence standard is permitted provided that the guidelines are applied in an advisory manner."). When sentencing resumes, the court shall consider the § 3353(a) factors and pronounce sentence.

### IV. UNCONTESTED ADVISORY GUIDELINES ISSUES

The applicable sentencing guideline for Defendant's violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) is USSG §2D1.1. *See* USSG App. A. Defendant's base offense level is **38**. USSG §2D1.1(a)(2). Besides the three issues discussed in the instant Sentencing Memorandum, no other adjustments or departures apply. Defendant is a Criminal History Category II.

### V. CONTESTED ADVISORY GUIDELINES ISSUES

#### A. *Possession of a Dangerous Weapon*

Section 2D1.1(b)(1) provides for a two-level enhancement "[i]f a dangerous weapon

3

(including a firearm) was possessed." USSG §2D1.1(b)(1). The enhancement "reflects the increased danger of violence when drug traffickers possess weapons." *Id.* §2D1.1 cmt. (n.3). It "should be applied if [a dangerous] weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.* Constructive possession of a dangerous weapon is sufficient to show that such a weapon was present. *See United States v. McCracken*, 110 F.3d 535, 542 (8th Cir. 1997) ("Lack of proof of use or actual possession does not prohibit a §2D1.1(b)(1) adjustment; enhancement for weapons possession may be based on constructive possession, which includes ownership, dominion, or control over the item, or dominion over the premises."). "The government has the burden of proving that the weapon was present and that it was not clearly improbable the weapon had a nexus to the criminal activity." *United States v. Cotton*, 22 F.3d 182, 185 (8th Cir. 1994); *see also United States v. Khang*, 904 F.2d 1219, 1223 n.7 (8th Cir. 1990) (rejecting view that the burden of proof should shift to the defendant once the government proves that a weapon was present).[2] It may meet this burden "by establishing that 'a temporal and spacial relation existed between the weapon, the drug trafficking activity, and [D]efendant.'" *United States v. Atkins*, 250 F.3d 1203, 1214 (8th Cir. 2001) (quoting *United States v. Payne*, 81 F.3d 759, 762 (8th Cir. 1996)).

---

[2] There is presently a circuit-split on the appropriate burden of proof. The vast majority of circuit courts of appeals shift the burden of proof to the defendant if the government proves that a weapon was present. *See, e.g., United States v. Hall*, 473 F.3d 1295, 1312 (10th Cir. 2007); *United States v. Anderson*, 452 F.3d 87, 90 (1st Cir. 2006); *United States v. Webb*, 335 F.3d 534, 537 (6th Cir. 2003); *United States v. Booker*, 248 F.3d 683, 689 (7th Cir. 2001); *United States v. Hall*, 46 F.3d 62, 63-64 (11th Cir. 1995); *United States v. Ortiz-Granados*, 12 F.3d 39, 41 (5th Cir. 1994); *United States v. Restrepo*, 884 F.2d 1294, 1296 (9th Cir. 1989); *see also United States v. Tolson*, 935 F. Supp. 17, 22 (D.D.C. 1996) (recognizing that issue is unresolved in the District of Columbia Circuit and adopting majority view). *But see United States v. Price*, 13 F.3d 711, 733 (3d Cir. 1994) (requiring government to prove that it was not clearly improbable that the weapon had a nexus to criminal activity).

The government maintains that Defendant possessed two weapons: a handgun and an AK-47 semi-automatic assault rifle. First, the government states that "Matt Fountain testified that he called in the help of [D]efendant in resisting other dealers who wanted to collect a drug debt [and] Defendant came to Fountain's apartment with a handgun." Government's Sentencing Memorandum ("Gov't Sent. Memo.") (docket no. 143) at 10; *see also* PSIR at ¶ 38 (same). Second, the government contends that Defendant stored an AK-47 semi-automatic assault rifle at Z.L.'s apartment.

### *1. Handgun*

The court has reviewed the transcripts of both trials and cannot find any testimony from Fountain consistent with the government's representations to the court. There is absolutely no evidence in the record that Defendant possessed a handgun at Fountain's apartment, in order to protect Fountain from other drug dealers.

The court recognizes that, despite Defendant's objection to the two-level enhancement for possession of the handgun, PSIR ¶ 38, Defendant did not *separately* object to paragraph 23 of the PSIR in his objection letter to the USPO.[3] In paragraph 23, the USPO wrote that "[o]n one occasion, Fountain called in the help of [D]efendant in resisting other drug dealers who wanted to collect a drug debt. . . . [D]efendant came to Fountain's apartment with a handgun." PSIR ¶ 23. When Defendant's objections to the PSIR are viewed as a whole, however, it is manifest that he objected to paragraph 23. For example, Defendant objected to paragraph 38 of the PSIR, which contained the factual allegations set forth in paragraph 23. In his objections to paragraph 38, Defendant specifically referenced paragraph 23 and objected to paragraph 23. Defendant's objection to paragraph 38, in conjunction with Defendant's pleadings and arguments to the court at the Hearing, were sufficiently specific to put the government and the court on notice that

---

[3] The court raises this potential issue *sua sponte*. The government does not ask the court to deem paragraph 23 of the PSIR admitted.

5

he was challenging the factual basis for the enhancement. Fed. R. Crim. P. 32. *Compare United States v. Sorrells*, 432 F.3d 836, 838 (8th Cir. 2005) (holding objections to PSIR were "sufficiently specific," where defendant "confusingly intermingled" his various objections but made his objections clear at the sentencing hearing and repeatedly characterized the uncharged conduct as "alleged"), *with United States v. Moser*, 168 F.3d 1130, 1132 (8th Cir. 1999) (holding that a defendant's "vague complaint about a 'lot of facts'" was not sufficiently specific).

Accordingly, the court holds that the government has not met its burden to prove by a preponderance of the evidence Defendant possessed a handgun. USSG §2D1.1(b)(1); *see, e.g., United States v. Poor Bear*, 359 F.3d 1038, 1041-44 (8th Cir. 2004) (reversing a defendant's sentence, because the defendant objected to factual allegations contained in his PSIR on an issue on which the government bore the burden of proof, but the government did not present evidence to prove the existence of the disputed facts).

### 2. *AK-47*

#### a. *Testimony*

The AK-47 presents a closer question. With respect to this issue, the government presented the following testimony at the Hearing:

##### i. *Debra Quaid*

Debra Quaid is the mother of Shawn Quaid, who shared an apartment with Z.L. in Cedar Rapids, Iowa, at the time of Z.L.'s death on January 10, 2001. Debra Quaid testified that, upon learning of Z.L.'s death, she went to the apartment. By the time she arrived, the police had left.

Debra Quaid testified that she entered Z.L.'s bedroom and saw blood all over his bed and the floor. She also saw drug paraphernalia and two small packets of aluminum foil.

Debra Quaid testified that she believed the sight of blood and drug paraphernalia

6

would upset Z.L.'s mother, so she took it upon herself to clean up Z.L.'s bedroom. While cleaning the bedroom, Debra Quaid discovered a black firearm under some clothes in Z.L.'s bedroom closet. At first, Debra Quaid thought the firearm was a toy gun, but when she picked it up, it was heavy. Debra Quaid is not familiar with firearms.

Debra Quaid further testified that she did not tell her son about the firearm. Instead, she put it in a large pizza delivery bag and placed the bag in the trunk of her car. She drove to her workplace and threw the firearm into a dumpster.

Lastly, Debra Quaid testified that, after Z.L.'s death, Shawn Quaid moved into her house. At least one month after Z.L.'s death, Shawn Quaid told Debra Quaid that someone named "Heavy" was harassing him about the whereabouts of the firearm. She told Shawn Quaid to tell "Heavy" that the gun was "gone," but Shawn Quaid told her that the caller did not believe him. One night, someone called Shawn Quaid about the firearm. Debra Quaid got on the phone and told the caller: "I don't know who you think you're talking to, but please, the gun is gone, it's nowhere to be found. You're not dealing with a nineteen-year-old kid anymore, this is Shawn's mom and I won't let you bully us." The caller hung up and that was the last she heard of him.

### ii. *Kerri Meyers*

Kerri Meyers was Shawn Quaid's girlfriend and one of Z.L.'s friends at the time of Z.L.'s death. She testified that she saw a firearm at the apartment on two occasions.

On the first occasion, about four to six weeks before Z.L.'s death, Z.L. showed a firearm to Meyers and Shawn Quaid. Z.L. stated that he was "holding onto [the firearm] for a friend." He then placed the firearm in his bedroom closet.

On the second occasion, Z.L. retrieved the firearm from the same closet. Z.L. told Meyers that the firearm was an AK-47. Although Meyers is not familiar with firearms and is not certain that the firearm was real, she believes the firearm looks similar to Exhibit 1B. Exhibit 1B is a photograph of an AK-47 with an extended stock.

7

### iii.     *Raymond Hardman*

Raymond Hardman was one of Z.L.'s friends and neighbors. Hardman testified that, approximately one week before Z.L.'s death, Z.L. showed Hardman an AK-47 with a collapsible stock. Hardman is familiar with AK-47s; Hardman previously owned an AK-47. Hardman testified that Z.L. told Hardman that Z.L. was "holding it for someone." The next day, Z.L. repeated this claim to Hardman. Z.L. never told Hardman that the AK-47 had any connection with drugs; Hardman had no idea why Z.L. was holding the AK-47.

Hardman further testified that, on the morning of Z.L.'s death, Hardman went to Z.L.'s apartment before the police arrived. Hardman told Shawn Quaid that he might want to "get rid" of the AK-47 before the police arrived.

### iv.     *Shawn Quaid*

Shawn Quaid testified that he had lived in the apartment with Z.L. since November of 2000. A week before Z.L.'s death, Z.L. told Shawn Quaid that Z.L. had a firearm and showed it to him. Shawn Quaid, who has some experience with firearms, recognized the firearm as an AK-47 with a collapsible stock. Z.L. told Shawn Quaid that Z.L. got the firearm from "Big D" and that "Big D" wanted Z.L. to hold onto it for him. At the Hearing, Z.L. speculated that "'Big D' needed to get rid of [the AK-47] for a certain reason—he couldn't have it."

Shawn Quaid also testified that, after Z.L. died, Shawn Quaid's mother came over to the apartment. Shawn Quaid pointed out the AK-47 to his mother. The AK-47 was propped up against a wall in the living room coat closet. His mother then took the AK-47 and disposed of it.

After Z.L.'s death, Shawn Quaid moved into his mother's house. About a week after Z.L.'s death, Shawn Quaid received a phone call about the AK-47. A man who claimed to be "Big D's brother" asked for the return of the AK-47. The man then handed

the phone to another man, and Shawn Quaid recognized the voice as Ricky Black. Black told Shawn Quaid that "Big D" told Black to retrieve the AK-47 for "Big D" or "Big D's brother." Eventually, Shawn Quaid handed the phone to his mother.

### *v.* *Wade Kisner*

Iowa Division of Criminal Investigation Special Agent Wade Kisner ("SA Kisner") testified that firearms, including AK-47s, are tools of the drug trade.

### b. *Factual Findings*

The court is unable to find by a preponderance of the evidence that Defendant possessed an AK-47. The court finds that there was an AK-47 in Z.L.'s apartment, but the government has not proven by a preponderance of the evidence that Defendant actually possessed the AK-47 or that Z.L. was holding onto the AK-47 for Defendant.

The government's evidence of possession is based primarily upon hearsay. Although the court may rely upon hearsay in a sentencing proceeding, the hearsay itself must be reliable. *United States v. Shevi*, 345 F.3d 675, 679 (8th Cir. 2003); *see also United States v. Fleck*, 413 F.3d 883, 894 (8th Cir. 2005) ("The rules of evidence do not apply at sentencing, but information considered by the sentencing court must have 'sufficient indicia of reliability to support [its] probable conclusion.'" (quoting *United States v. Jones*, 195 F.3d 379, 385 (8th Cir. 1999)). Here, the hearsay is not reliable. There are significant discrepancies in the testimony of the government's witnesses. For example, Debra Quaid testified that she discovered the AK-47 in Z.L.'s bedroom closet; Shawn Quaid testified that he pointed out the AK-47 to her, and that it was propped up against a wall in the living room closet. Debra Quaid testified that "Heavy" was asking her son about the whereabouts of the AK-47; Shawn Quaid testified that he received a call from "Big D's brother" and "Ricky Black," on behalf of "Big D."

The trial evidence showed that "Big D" is a known alias of Defendant. It also showed, however, that Z.L. was a drug dealer. The AK-47 was never recovered, so there

9

is no physical evidence that ties the AK-47 to Defendant. Shawn Quaid's mother, Debra Quaid, admitted that she disposed of the AK-47. The court cannot find that the AK-47 was Defendant's firearm, as opposed to Shawn Quaid's or Z.L.'s firearm. Further, the government has not proven a temporal or spacial relationship between the AK-47, drug-trafficking activity and Defendant. *Compare United States v. Bost*, 968 F.2d 729, 731-32 (8th Cir. 1992) (reversing district court's finding of possession of a dangerous weapon on a theory of constructive possession, where (1) there was no evidence that defendant actually possessed a firearm; (2) there was no evidence that a firearm was present during a drug transaction; (3) indicted coconspirator had purchased the weapon; (4) and there was "no contemporaneity between [the] charged offense and the discovery of the weapon at the Mini-Mart"), *with United States v. Betz*, 82 F.3d 205, 211 (8th Cir. 1996) (affirming district court's finding of possession of dangerous weapon, even though a weapon was not found with the defendant's stash of drugs, where guns were found "on premises from which [the defendant] conducted drug-related activities") *and United States v. Pou*, 953 F.2d 363, 371 (8th Cir. 1992) (affirming district court's finding of possession of a dangerous weapon, where "[f]irearms were seen in [the defendant's] apartment on more than one occasion, the same apartment from which cocaine was distributed").

### 3.  *Conclusion*

Accordingly, the court holds that a two-level enhancement for possession of a dangerous weapon is not appropriate. USSG §2D1.1(b)(1).

### B.  *Aggravating Role*

Section 3B1.1 provides:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> **(a)**   If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.

10

> **(b)** If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
>
> **(c)** If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in **(a)** or **(b)**, increase by **2** levels.

USSG §3B1.1 (emphasis in original). The commentary to §3B1.1 further provides:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.
>
> Background: This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense. This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.
>
> In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or

11

> preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of § 3B1.1(c).

USSG §3B1.1 cmt. n.4 & cmt. (backg'd).

The terms "organizer" and "leader" are broadly construed. *United States v. Willis*, 433 F.3d 634, 636 (8th Cir.), *cert. denied*, 127 S. Ct. 144 (2006). There can be more than one "organizer" or "leader" of a criminal activity. *United States v. Zimmer*, 299 F.3d 710, 719 (8th Cir. 2002). It is not necessary that Defendant organized or led all of his co-conspirators. *Id.* A defendant who recruits accomplices and directs their activities is an "organizer" and "leader." *Id.* A "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." USSG §3B1.1, cmt. (n.1). The government bears the burden of proving, by a preponderance of the evidence, the facts necessary to establish Defendant's aggravating role in the offense. *Zimmer*, 299 F.3d at 719.

The government maintains that a two-level increase pursuant to USSG §3B1.1(c) is appropriate. The government contends that Defendant occupied a leadership role with respect to two individuals: Tavar Stephens and Z.L. The court considers each argument, in turn.

### 1. *Tavar Stephens*

In support of a role enhancement with respect to Tavar Stephens, the government points out: (1) "Mindi Lawless testfied [at trial] that on one or more occasions when she called [D]efendant to purchase heroin, a person she understood to be [D]efendant's cousin showed up and delivered the heroin for him"; (2) "Lawless identified by photo [D]efendant's cousin as Tavar Stephens"; and (3) "[h]er testimony was corroborated when, a few months after the distribution to [Z.L.] in January 2001, [D]efendant and Tavar

12

Stephens were arrested in Cedar Rapids during an unrelated traffic stop at approximately 2:30 a.m., in a car rented in Chicago, and [D]efendant was found in possession of $1,302 cash." Gov't Sent. Memo. at 13.

At trial, Lawless testified that, on about ten occasions from about 2000 until 2002, she purchased heroin from Defendant, whom she knew as "Big D." She stated that, on one or two of those occasions, she called Big D for heroin and "a cousin . . . about the same height as Big D" would answer the phone and deliver the heroin. Exhibit 2A at 11 (first trial); *see also* Exhibit 2B at 11-12 (similar testimony at second trial). Lawless was a heroin addict at the time.

At the Hearing, SA Kisner testified that he knew about a traffic stop of the Defendant in the early morning hours of May 14, 2001, in Cedar Rapids, Iowa. According to SA Kisner, a police report stated that Defendant was stopped with Tavar Stephens. Stephens identified himself as Defendant's cousin. Defendant and Stephens were traveling in a car, which was rented in Chicago in Defendant's name. Law enforcement officers searched the car and Defendant's person. They found a half-smoked marijuana blunt underneath the driver's seat and marijuana residue in various places in the car. They discovered marijuana residue on Stephens's person and $1,302 in cash on Defendant's person.

The court finds that the government has not proven by a preponderance of the evidence that Defendant had an aggravating role with respect to Tavar Stephens. At most, the evidence shows that Defendant and Stephens worked together to sell illegal drugs,[4] but

---

[4] On August 11, 2004, then-Chief Judge Mark W. Bennett sentenced Stephens to 87 months of imprisonment, after Stephens pled guilty to distribution of cocaine base and heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) and (b)(1)(C). *See United States v. Stephens*, No. 03-CR-82-MWB (N.D. Iowa Aug. 11, 2004). The government called Stephens to testify at Defendant's first trial, but Stephens defied a court order and refused. *See United States v. Ragland*, No. 06-CR-01-LRR, 2006 U.S. Dist. LEXIS 71776 (Sept.
(continued…)

13

it is unclear whether Defendant was an organizer, leader, manager or supervisor. It is unclear from the record whether Defendant controlled or instructed Stephens, or *vice versa*. *Cf. United States v. Mull*, 181 Fed. Appx. 610, 612 (8th Cir. 2006) (affirming two-level enhancement pursuant to §3B1.1(c) where evidence showed that the defendant controlled another person); *United States v. Voegtlin*, 437 F.3d 741, 748 (8th Cir. 2006) (affirming two-level enhancement pursuant to §3B1.1(c) where evidence showed that the defendant instructed three other persons to obtain pseudoephedrine pills and bring them to him, as well as provided them the money to buy the pills).

### 2. Z.L.

In support of a role enhancement with respect to Z.L., the government alleges that the evidence presented at trial and the Hearing shows that "Defendant sold [Z.L.] drugs for resale to others, [and] cut and packaged drugs at [Z.L.'s] apartment, and had [Z.L.] store a tool of the drug trade, an AK-47 assault rifle, at [Z.L.'s] apartment." Gov't Sent. Memo. (docket no. 143) at 14. Again, the court is not convinced that Defendant stored an AK-47 at Z.L.'s apartment. Further, "[i]n a drug conspiracy case, 'a defendant must do more than sell for resale' to be found an organizer or leader.'" *Willis*, 433 F.3d at 634 (quoting *United States v. Miller*, 91 F.3d 1160, 1164 (8th Cir. 1996)). The government does not argue that Defendant recruited Z.L. or instructed him to cut and package drugs. *Cf. id.* (affirming imposition of four-level enhancement, pursuant to pursuant to §3B1.1(a), where district court found that the defendant recruited others to sell crack for him). There is no evidence before the court that Z.L. acted at the request or for the benefit of

---

[4](…continued)
29, 2006). Stephens later pled guilty to Criminal Contempt, in violation of 18 U.S.C. § 401(3). On October 19, 2006, the undersigned sentenced Stephens to one year and one day in prison and ordered such sentence to run consecutive to his other sentence.

Defendant.[5]

### 3. *Conclusion*

Accordingly, the court holds that any enhancement, including a two-level enhancement, for aggravated role in the offense is not appropriate. USSG §3B1.1.

## C. *Departure for Victim's Conduct*

Defendant argues that Z.L.'s conduct in mixing heroin with morphine, cocaine, methadone, marijuana and benzodiazepines justifies a downward departure. Defendant

---

[5] The government relies, in part, upon *United States v. Holt*, 969 F.2d 685, 687-88 (8th Cir. 1992) as authority for a two-level enhancement. The government parenthetically characterizes *Holt* as a case in which the enhancement applied, because the "defendant used a woman's house to store drugs and to 'cut up' and package drugs." Gov't Sent. Memo. (docket no. 143) at 14. *Holt* is clearly distinguishable. In *Holt*, the Eighth Circuit Court of Appeals found the following evidence "less than overwhelming, but still sufficient" to support a four-level enhancement pursuant to USSG §3B1.1(a):

> Perfetto conceded that he "organized" Regina Mecklin, his girlfriend. In addition, Perfetto fronted cocaine to Michelle Crivac, a subdealer, and called her daily to monitor her progress in selling it. He also used her house to store and "cut up" large amounts of cocaine. Perfetto threatened subdealers Scott Kirsch and Paul Server when they failed to pay him on time. He also taught Kirsch how to cut cocaine to earn a larger profit. Finally, the District Court did not clearly err in finding that Robert Brophy and Gene Kruger, also subdealers of Perfetto, were organized by Perfetto. Brophy and Kruger each bought cocaine from Perfetto on a regular basis, which Perfetto knew was being resold. Moreover, Brophy once served as a middleman to get cocaine from the supplier in Florida to Perfetto. While the government's charge that Perfetto organized five people may have bordered on overzealousness, we cannot say that the District Court clearly erred in so finding.

*Holt*, 969 F.2d at 687-88.

opines that heroin alone did not and could not have caused Z.L.'s death.

In discussing the propriety of Chapter 5 departures generally, the Eighth Circuit Court of Appeals recently summarized:

> Departures are appropriate if the sentencing court finds that there exists an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." USSG §5K2.0. The guidelines provide that sentencing courts [are] to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, a court may consider whether a departure is warranted. USSG §1A1.1, cmt. (n.4(b)).

*United States v. Chase*, 451 F.3d 474, 482 (8th Cir. 2006) (formatting altered). The decision whether to depart from the advisory Sentencing Guidelines rests within the sound discretion of the district court. *See, e.g., United States v. Thin Elk*, 321 F.3d 704, 707-08 (8th Cir. 2003) (reviewing for an abuse of discretion "because the decision to depart embodies the traditional exercise of discretion by the sentencing judge" (citations and internal quotation marks omitted)). However, "[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases . . . ." *Koon v. United States*, 518 U.S. 81, 98 (1996). The district court must "carefully articulate the reasons for departure, particularly where the waters are unchartered." *United States v. Reinke*, 283 F.3d 918, 925-26 (8th Cir. 2002) (citing *Koon*, 518 U.S. at 95)).

"The district court is not left adrift . . . in determining which cases fall within and which cases fall outside of the 'heartland.'" *United States v. McCart*, 377 F.3d 874, 877

(8th Cir. 2004) (citing *Koon*, 518 U.S. at 94). In USSG §5K2.1 *et seq.*, "[t]he Sentencing Commission enumerated some of the factors that it believed are not adequately accounted for in the formulation of the [Sentencing] Guidelines and might merit consideration as aggravating or mitigating circumstances." *Thin Elk*, 321 F.3d at 708 (citing USSG §5K2.0). The enumerated factors that might merit consideration as aggravating circumstances are so-called "encouraged" factors. *See, e.g., McCart*, 377 F.3d at 877 (discussing "encouraged" and "discouraged" factors). "'If the [enumerated] factor is an encouraged factor, the court is authorized to depart if the applicable [Sentencing] Guideline does not already take it into account.'" *Id.* (quoting *Koon*, 518 U.S. at 96).

In support of his argument for a downward departure, Defendant invokes USSG §5K2.10 (Victim's Conduct).[6] Section 5K2.10 provides:

> If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense. In deciding whether a sentence reduction is warranted, and the extent of such reduction, the court should consider the following:
>
> (1) The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.
>
> (2) The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.
>
> (3) The danger reasonably perceived by the defendant, including the victim's reputation for violence.

---

[6] At the Hearing, Defendant made clear that he was only relying upon USSG §5K2.10 to support his motion for a downward departure.

17

> (4) The danger actually presented to the defendant by the victim.
>
> (5) Any other relevant conduct by the victim that substantially contributed to the danger presented.
>
> (6) The proportionality and reasonableness of the defendant's response to the victim's provocation.
>
> Victim misconduct ordinarily would not be sufficient to warrant application of this provision in the context of offenses under Chapter Two, Part A, Subpart 3 (Criminal Sexual Abuse). In addition, this provision usually would not be relevant in the context of non-violent offenses. There may, however, be unusual circumstances in which substantial victim misconduct would warrant a reduced penalty in the case of a non-violent offense. For example, an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation.

USSG §5K2.10. Defendant requests a five-level downward departure.

The court has serious doubts as to whether §5K2.10 applies here, because it strains reason to characterize Z.L.'s drug use as "provoking" Defendant's sale of heroin. *Id.* However, the court shall assume without deciding that §5K2.10 grants it the authority to depart downward in this case. After considering the six factors in §5K2.10, the court finds that a downward departure is not warranted. Although "[v]ictim misconduct [is] an encouraged basis for departure," *Koon*, 518 U.S. at 101, the court finds that this case falls inside the heartland of cases. *Cf. United States v. Yellow Earrings,* 891 F.2d 650, 652-55 (8th Cir. 1989) (affirming downward departure from a Sentencing Guidelines range of forty-one to fifty-one months of imprisonment to a sentence of fifteen months of imprisonment, where evidence showed that victim substantially provoked offense); *United States v. DeJesus*, 75 F. Supp. 2d 141, 144-45 (S.D.N.Y. 1999) (finding four-level

18

departure warranted pursuant to §5K2.10 where defendant assaulted victim after victim beat up defendant's pregnant girlfriend and threatened to kill girlfriend and defendant); *United States v. Saunders*, 743 F. Supp. 444, 446-47 (E.D. Va. 1990) (holding victim's drug use did not warrant downward departure pursuant to §5K2.10 in rape prosecution, because "the law protects all persons from rape, regardless of their past virtue and history, or even their criminal conduct"), *aff'd*, 943 F.2d 388 (4th Cir. 1991).[7]

### VI. CONCLUSION

**Defendant's base offense level under the advisory Sentencing Guidelines is 38**. USSG §2D1.1(a)(2). No other enhancements or departures apply. Because Defendant is **Criminal History Category II**, **Defendant's advisory Sentencing Guidelines range is 262 to 327 months' imprisonment.** *See* USSG Sentencing Table.

**IT IS SO ORDERED.**

**DATED** this 23d day of May, 2007.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

---

[7] Defendant remains free to argue for a downward variance from the advisory Sentencing Guidelines range when sentencing resumes.

19